IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HAPPY PHOTO SHOPPES, INC., t/a : | |
| RIVER LOOP FERRY CORP. OF NJ, : | |
| Plaintiff, : | |
| : | CIVIL ACTION |
| v. : | No. 16-5071 |
| : | |
| RIVERSHORE CHARTERS, INC., and : | |
| MARK PERRY, : | |
| Defendants. : | |

MCHUGH, J.                                                                                                                   July 6, 2017

## MEMORANDUM

This case concerns a breach of contract action by a Pennsylvania Plaintiff against Defendants from Virginia. The question before me is whether, under Pennsylvania's long-arm statute, this Court can exercise personal jurisdiction over Defendants. Because I find that Defendants established constitutionally sufficient minimum contacts with Pennsylvania, I conclude that jurisdiction is proper.

## I.   BACKGROUND

In or around September 2012, Alfred Krawitz, president of Plaintiff of Happy Photo Shoppes, Inc. (Happy Photo),[1] placed an ad on the website of *Boats and Harbors Magazine*, offering the sale of the *Riverloop*, a commercial sight-seeing vessel that was then docked in Philadelphia. Krawitz's ad attracted the interest of Defendant Mark Perry, a commercial boat captain and the sole owner of Co-Defendant Rivershore Charters, Inc. (Rivershore). In September and again in November, Perry traveled from his home in Virginia to Philadelphia to inspect the *Riverloop* and discuss terms with Krawitz. Krawitz's asking price was too high, however, and the meetings failed to produce a deal.

---

[1] Happy Photo trades as River Loop Ferry Corp. of NJ. Despite this trade name, it is undisputed that Happy Photo is a Pennsylvania resident.

1

Nevertheless, Perry and Krawitz continued their discussions over the course of the next year-and-a-half through sporadic phone and e-mail communications. During this time, the City of Philadelphia revoked Krawitz's docking privileges, and Krawitz moved the *Riverloop* to a dock in Wilmington, Delaware. It was there, in April 2014, that Perry and Krawitz next met in person. By this time, Krawitz had abandoned his original plan of an outright sale of the *Riverloop* and had decided instead to lease the boat to Rivershore. In anticipation of a final lease agreement, Perry took possession of the *Riverloop* following the April meeting and piloted the vessel from Delaware first to a Coast Guard inspection station in Maryland and then to his dock in Virginia. After additional negotiations by e-mail and phone, Perry and Krawitz agreed in May on a final set of terms, which were memorialized in a "Bareboat Boat Charter Agreement" (Agreement).

The Agreement provided for a two-year renewable lease. Rivershore agreed to pay Happy Photo up to thirty percent of the gross receipts earned by the *Riverloop*, but in no event less than $25,000 per year, in twelve monthly installments. Rivershore further agreed to replace and repair, "at the outset of the lease, . . . carpet, ceiling tiles, roof a/c, [and] toilet parts" and to provide Happy Photo with notice before doing so. Happy Photo retained the right to retake possession of the Riverloop if Rivershore missed a lease payment, and to terminate the Agreement (for any reason) upon thirty days' written notice. Though it contained no forum selection clause, the Agreement stipulated that it was to be enforced under to Pennsylvania law.

Perry signed the Agreement in Virginia and mailed a completed copy to Krawitz in Philadelphia. Rivershore sent Happy Photo the first monthly payment due under the Agreement, but a short time later, Perry and Kraswitz disagreed over the cost of repairs to the *Riverloop* and no further payments were made. Pursuant to the Agreement's cancellation and termination provisions, Krawitz retook possession of the *Riverloop* in July or August, 2016, and later filed the instant breach of

2

contract action. Perry and Rivershore, both residents of Virginia, now seek dismissal for lack of personal jurisdiction pursuant to Rule 12(b)(2).

## II. STANDARD

"To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff bears the burden of establishing the court's jurisdiction over the moving defendants." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004). Where, as here, "the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Id.*

## III. DISCUSSION

To determine whether personal jurisdiction is proper, a district court sitting in diversity applies the law of the forum state. Fed. R. Civ. P. 4(e). Pennsylvania's long-arm statute, 42 Pa. Cons. Stat. Ann. § 5322(b), has a reach coextensive with the limits of the Fourteenth Amendment's Due Process Clause. "Accordingly, in determining whether personal jurisdiction exists, we ask whether, under the Due Process Clause, the defendant has certain minimum contacts with Pennsylvania such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)).

Personal jurisdiction may be either general or specific. The only question here is whether Pennsylvania can assert specific jurisdiction over Defendants.

> The inquiry as to whether specific jurisdiction exists has three parts. First, the defendant must have purposefully directed its activities at the forum. Second, the litigation must arise out of or relate to at least one of those activities. And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comports with fair play and substantial justice.

*Id*. at 317 (citations omitted).

3

### A. Purposeful Availment

"At the threshold, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum. . . . [W]hat is necessary is a deliberate targeting of the forum." *Id.* (citations omitted). Defendants contend that this case's only connection with Pennsylvania is Plaintiff's residence there. Noting that "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there," *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014), they argue that their business dealings with Plaintiff do not establish personal jurisdiction here. I disagree.

In contract cases like this, the Third Circuit directs courts to "analyze the totality of the circumstances surrounding a contract to determine whether the exercise of jurisdiction over the defendant is proper." *Miller Yacht Sales*, 384 F.3d at 99.[2]

> The mere existence of a contract is insufficient to establish minimum contacts. . . . But a contract is typically an intermediate step between past negotiations and future transactions, and . . . it is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum.

*Budget Blinds, Inc. v. White*, 536 F.3d 244, 261 (3d Cir. 2008) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985)). Ultimately, "[c]ourts are not reluctant to find personal jurisdiction" over "[p]arties who reach out beyond their state and create continuing relationships and obligations with citizens of another state." *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) (quoting *Burger King*, 471 U.S. at 482).

It is a close question, but under the "totality of the circumstances" test, I find that Defendants have purposefully availed themselves of the privilege of conducting business in Pennsylvania. After responding to Krawitz's ad, Perry traveled to Philadelphia twice in order to inspect the *Riverloop* and

---

[2] The Third Circuit has frequently examined personal jurisdiction in cases where, as here, the defendant's contact with the forum state arises out of a contractual relationship with the plaintiff. Unfortunately, neither party has briefed a single decision from this line of binding case law.

discuss terms with Krawitz—physical presence in the forum that weighs against dismissal. *See id*. Moreover, when Perry's trips to Philadelphia failed to produce a deal, he maintained e-mail and phone contact with Krawitz for more than year until the two reached a tentative lease arrangement. Although such "informational communications" alone are insufficient grounds for personal jurisdiction, *Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co.*, 75 F.3d 147, 152 (3d Cir. 1996), the prolonged course of negotiation further demonstrates Perry's purposeful direction of business activity toward Pennsylvania. *See Remick v. Manfredy*, 238 F.3d 248, 256 (3d Cir. 2001) (citing *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993) ("Mail and telephone communications sent by the defendant into the forum may count toward the minimum contacts that support jurisdiction.")).

More important still, the Agreement's terms, and the parties' course of dealing, evince the type of "continuing relationships and obligations" that support specific jurisdiction in contract cases. For instance, the Agreement required Defendants to notify Plaintiff before making any of the anticipated upgrades to the *Riverloop*'s carpet, ceiling, and bathroom fixtures—indeed, the fight over costs that ultimately led to the parties' falling out arose from these contemplated communications. The Agreement also required Defendants to make monthly lease payments—a periodic compensation scheme that further ensured regular contacts between the parties over the course of the lease's two-year term. *Cf. Budget Blinds*, 536 F.3d at 262 (questioning whether a contract that "merely describes what will happen in the event of default" could support specific jurisdiction based on contemplated future contacts between the parties). Finally, I find it significant that the Agreement contained a Pennsylvania choice-of-law provision and was signed by Krawitz in, after being signed by Perry and mailed to, Pennsylvania. *See Remick*, 238 F.3d at 256 (noting significance of similar factors). In light of Defendants' pursuit and formation of a business venture with a known resident of Pennsylvania, I find these factors "reinforce [Defendants'] deliberate affiliation with the forum State and the

5

reasonable foreseeability of possible litigation there." *Budget Blinds*, 536 F.3d at 261 (quoting *Burger King*, 471 U.S. at 482).

In sum, Defendants' actions during pre-contract negotiations, the parties' course of dealing within the contractual relationship, and the terms of the Agreement itself establish purposeful availment. Although I do not believe that any one of these factors, standing alone, would justify the exercise of specific jurisdiction, their combined force is sufficient.

### B. Relatedness

"Identifying some purposeful contact with the forum is but the first step in the specific-jurisdiction analysis. The plaintiffs' claims must also arise out of or relate to at least one of those contacts." *O'Connor*, 496 F.3d at 318 (citing *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 (1984)). "In contract cases, courts should inquire whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach." *Gen. Elec. Co.*, 270 F.3d at 150. Defendants offer no argument regarding this element of the specific jurisdiction test, nor could they. As discussed at length above, their telephonic, electronic, and physical contacts with Pennsylvania were essential to the Agreement's formation. The relatedness element is therefore satisfied.

### C. Fair Play and Substantial Justice

Finally, I must determine whether "the exercise of jurisdiction would offend "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316. Relevant considerations include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, [and] the interstate judicial system's interest in obtaining the most efficient resolution of controversies." *Burger King*, 471 U.S. at 477. Because I have found that Defendants made minimum contacts with Pennsylvania, they "must present

a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.*

Defendants fail to carry this burden.[3] Plaintiff has a strong interest in litigating this matter in its home state and Pennsylvania has a strong interest in providing a forum for its injured residents. Moreover, because the Agreement includes a Pennsylvania choice-of-law provision, there is no concern about frustrating the policies of another state. Finally, while "the burden on the defendant is a primary concern in any case," *O'Connor*, 496 F.3d at 324, this alone is insufficient grounds to defeat otherwise constitutional jurisdiction. "When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the . . . defendant." *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 114 (1987). That is the case here.

## IV.  CONCLUSION

For the forgoing reasons, Defendants' Motion to Dismiss will be denied. An appropriate order follows.

    /s/ Gerald Austin McHugh
United States District Judge

---

[3] In fact, Defendants make no argument why exercising jurisdiction in Pennsylvania would offend traditional notions of fair play and substantial justice.